*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| OAKLY ENTERPRISES, LLC, and RYAN FRIESEN, | ) ) ) | Supreme Court No. S-15159 |
| Appellants, | ) ) ) | Superior Court Nos. 3PA-08-01671 CI and 3PA-08-01349 CI (Consolidated) |
| v. | ) ) | |
| NPI, LLC; NPI TIMBER, LLC; and COREY WHITNEY, individually and d/b/a WHITNEY LOGGING, | ) ) ) ) | O P I N I O N<br><br>No. 7042 - August 28, 2015 |
| Appellees. | ) ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Kari Kristiansen, Judge.

Appearances: David D. Clark, Law Office of David Clark, Anchorage, for Appellant. Jonathon A. Katcher, Pope & Katcher, and Debra J. Fitzgerald, Anchorage, for Appellees.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

MAASSEN, Justice.

## I.  INTRODUCTION

This case arises from a dispute over whether the owner of a wood chipper may be held jointly and severally liable, along with two property owners, for damages caused to their property by the chipper's leak of diesel fuel. The chipper's owner had leased it to another person, who abandoned it. The property owners claim they were

only severally liable, if at all, for a portion of the damages and that the chipper's owner was liable for the rest. A jury found that the chipper did not contaminate one of the two properties, but as for the other the jury found its owner jointly and severally liable, along with the chipper's owner. The superior court then equitably allocated damages among the liable property owner, the owner of the chipper, and the chipper's lessee. This allocation left the property owner liable for most of his own loss.

Both property owners appeal the superior court's decision to equitably allocate damages.[1] They also appeal an evidentiary ruling and the award of attorney's fees. We affirm, holding that the superior court properly construed the governing statutes and the evidence rules and that its award of attorney's fees was not an abuse of discretion.

## II.    FACTS AND PROCEEDINGS

Ryan Friesen and Oakly Enterprises, LLC, own properties across the road from each other in Wasilla. Oakly Enterprises is a family-owned corporation, owned half by Friesen and half by his father and stepmother.

In 2004 a logger named Corey Whitney leased wood chipping equipment from NPI, LLC, a company involved in construction and timber leases. Whitney later entered into a lease with Oakly Enterprises for a shop and a place to store some of the leased equipment. He entered into another lease with Friesen for a heavy equipment parking area, where he parked the piece of equipment at issue here — a 1995 Peterson chipper he had leased from NPI.

In early 2006 the Alaska Department of Environmental Conservation discovered several diesel spills on the Oakly Enterprises property, near the chipper. In

---

[1]    Although the property owners fared differently in the superior court, they present their arguments jointly on appeal.

June the Department sent notices of violation to Whitney and Oakly Enterprises, asserting that they had violated state regulations[2] by failing to contact the Department and submit a site characterization plan before cleaning up surface stains from the diesel spills. Neither Whitney nor Oakly Enterprises was cooperative. In May 2007 Whitney notified Oakly Enterprises that he would vacate its property at the end of June, and in early July he transported some of the leased equipment back to NPI at Port MacKenzie, a commercial and industrial area on Cook Inlet. Whitney left the remainder of the equipment, including the Peterson chipper, in place on Friesen's and Oakly Enterprises' properties.

In July 2007 Friesen hand-delivered a letter to NPI claiming he had become "aware of some pretty large oil spills" on his property and would "start cleanup [him]self to prevent further pollution" if NPI did not respond within five days. Four days later he moved the Peterson chipper to property owned by his father. During the months that followed, NPI removed most of its remaining equipment from the Friesen and Oakly Enterprises properties, but it did not undertake any environmental cleanup. It recovered the Peterson chipper in October 2008.

In 2009 Friesen and Oakly Enterprises brought suit against NPI and Whitney, seeking damages in excess of $150,000 for the contamination of their properties, costs of cleanup, and rent.[3] Whitney did not answer the complaint, and a

---

[2]     18 Alaska Administrative Code (AAC) 75.335 (2015) provides in relevant part, "(a) Before proceeding with site cleanup under the site cleanup rules, a responsible person shall characterize the extent of hazardous substance contamination at the site. (b) A responsible person shall submit a site characterization workplan to the department for approval before beginning site characterization work."

[3]     Oakly and Friesen each brought suit under a variety of theories, including
(continued...)

default judgment was entered against him. The superior court initially granted summary judgment to NPI, holding that NPI was not liable for Whitney's actions in polluting the Friesen and Oakly Enterprises properties as the "operator" of the involved "facility" (as these terms are defined for purposes of AS 46.03.822, which imposes strict liability for damages and other costs "resulting from an unpermitted release of a hazardous substance"); as the lessor of the Peterson chipper; as Whitney's principal in an agency relationship; or through a veil-piercing "sham transaction" theory. On reconsideration, however, the superior court found genuine issues of material fact regarding NPI's liability under several theories, including whether it could be held liable as an "owner" or "operator" under AS 46.03.822 and whether it was liable for rent and other costs incurred after Whitney abandoned the Peterson chipper on the plaintiffs' property. The superior court also granted NPI's motion in limine to exclude a report on environmental conditions at NPI's Port MacKenzie property, which Friesen had planned to introduce "to rebut [NPI's] assertion that it ran a clean camp."

The superior court conducted an eight-day jury trial on the issue of whether NPI was liable for any of Friesen's and Oakly Enterprises' damages. The jury instructions included one on "avoidable consequences," proposed by NPI, and a corresponding verdict form asking the jury to affix a dollar amount to the damages Friesen reasonably could have avoided, if any.[4] Answering specific questions on the

---

[3](...continued)
trespass, negligence, and agency liability, but they ultimately limited their environmental claims to strict liability under AS 46.03.822, and their cases were consolidated.

[4]     The instruction stated:

Ryan Friesen is not entitled to be paid for any loss or for part of any loss he could have avoided with reasonable efforts and

(continued...)

special verdict form, the jury found that NPI was not the "operator of a facility" from which diesel fuel was spilled on Oakly Enterprises' property but that the diesel spill on Friesen's property came from the Peterson chipper. It found that "the reasonable costs of repairing the damage to the Ryan Friesen real property from the diesel spills" was $38,437, and that Friesen reasonably incurred $14,990 in expenses "in an effort to avoid or reduce other losses he reasonably believed were caused by NPI's 1995 Peterson Chipper on his land."[5] Finally, the jury answered "Yes" to the question whether Friesen could "reasonably have avoided all or part of the diesel spill on [his] property," and it found that "the dollar amount of loss to Ryan Friesen due to the diesel spill on [his] property that [he] reasonably could have avoided" was $7,687.40 (20 percent of the total amount it had found to represent the reasonable costs of repair).

NPI filed a post-trial motion asking the court "to equitably allocate damages among the parties through the contribution process found in AS 46.03.882(j)." The court granted NPI's motion in a comprehensive order that detailed the history of the parties' dispute, set out the jury's factual findings, and identified the equitable factors the court considered relevant. These included the "Gore factors," which the court described in

---

[4](...continued)
> without undue risk, hardship, or embarrassment, even though the loss originally resulted from an act or omission for which NPI or Whitney is legally responsible. If you decide that it is more likely true than not true that Ryan Friesen could have avoided any loss or any part of any loss with reasonable efforts and without undue risk, hardship or embarrassment, you may not require NPI or Whitney to pay the amount Ryan Friesen could have reasonably avoided.

[5]     This latter amount, representing Friesen's expenses in moving the chipper from his property to property owned by his father, was reduced by remittitur to $10,787.

shorthand as "1) fault, 2) amount, 3) toxicity, 4) involvement, 5) care[,] and 6) cooperation."[6] Other equitable factors the court found relevant were "failure to mitigate environmental damage, laches, unclean hands, and moral culpability." Applying these factors to the facts of the case, the court concluded that "[t]he most equitable and fairest means of dividing responsibility for the diesel spill is to allocate fault based upon the amount of time each party had responsibility for and control over the leaking chipper." The court found that for 115 days — 96 percent of the 119 days the chipper was leaking diesel onto Friesen's property — "both Whitney and Ryan [Friesen] knew or should have known that the chipper was leaking, and had the ability to control the chipper and/or the land," whereas NPI had knowledge of the leak and control over the chipper for only the remaining four percent of time, after Friesen delivered his notice. The court therefore made this initial allocation of fault: 48 percent to Whitney, 48 percent to Friesen, and four percent to NPI.

---

[6]     "[T]he so-called 'Gore Factors[]' find their source in the legislative history (and unsuccessful amendment) of CERCLA [the federal Comprehensive Environmental Response, Compensation and Liability Act] by then-Representative Al Gore." *Lockheed Martin Corp. v. United States*, 35 F. Supp. 3d 92, 123 (D.D.C. 2014). In longhand, the factors are "[1.] the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished; [2.] the amount of the hazardous waste involved; [3.] the degree of toxicity of the hazardous waste involved; [4.] the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste; [5.] the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and [6.] the degree of cooperation by the parties with Federal, State or local officials to prevent any harm to the public health or the environment." *Id.* (alterations in original) (quoting *Envtl. Transp. Sys., Inc. v. ENSCO, Inc.*, 969 F.2d 503, 508 (7th Cir. 1992)).

The court further concluded that Whitney's share of damages was uncollectible and was thus an orphan share.[7] It divided the orphan share between Friesen and NPI in proportion to their relative shares of damages, with the result that Friesen was responsible for $35,423.54 of the costs of remediating Friesen's property and NPI was responsible for the remaining $3,013.46. The court subsequently applied the same analysis to Friesen's expenses in removing the chipper from his property (the $14,990 the jury found to be his removal expenses, reduced on remittitur to $10,787). It found that NPI could have recovered the chipper for considerably less money than Friesen spent moving it but that Friesen and his father "unreasonably and unjustifiably refused to return the chipper to NPI for fifteen months." Using the same percentages it had used for the costs of repair, the court concluded that Friesen was responsible for $9,941.30 of the removal expenses and NPI was responsible for the remaining $845.70.

The court found that neither NPI nor Friesen was the prevailing party on the claim between them. However, it found that NPI prevailed over Oakly Enterprises, and it awarded NPI attorney's fees from Oakly Enterprises in the amount of $36,764.63.

---

[7] Under CERCLA, "orphan shares" have been defined as response costs attributable to bankrupt or financially insolvent potentially responsible parties, which are allocated or apportioned among all solvent potentially responsible parties to the litigation. *See Charter Twp. of Oshtemo v. Am. Cyanamid Co.*, 898 F. Supp. 506, 508-09 (W.D. Mich. 1995).

"Potentially responsible party" is another term of art, "promulgated by the EPA to represent parties subject to liability for cleanup costs under CERCLA section 107(a)." Larry M. Sargent, *Environmental Law — AM International, Inc. v. International Forging Equipment: Release Agreements Between Private Parties Under CERCLA*, 21 MEM. ST. U.L.REV. 423, 426 n.28 (1991). It is reflected in Alaska law: "Any entity that may be required to take financial responsibility for cleaning up a contaminated site is a potentially responsible party." *Fed. Deposit Ins. Corp. v. Laidlaw Transit, Inc.*, 21 P.3d 344, 349 (Alaska 2001) (citing AS 46.03.822(a)(3)).

Friesen and Oakly Enterprises appeal the superior court's decision to grant NPI's motion for contribution. They argue that the jury's avoidable consequences finding apportioned the harms caused by the diesel spill under AS 46.03.822(i) and contribution was unnecessary. They also appeal the superior court's exclusion of the report evidencing the condition of NPI's Port MacKenzie property, as well as the calculation of NPI's attorney's fee award.

## III. STANDARDS OF REVIEW

The superior court's decision to allocate and apply contribution to a damage award involves the interpretation and application of a statute.[8] Questions regarding the interpretation and application of a statute are "questions of law to which we apply our independent judgment."[9] We interpret statutes "according to reason, practicality, and common sense, taking into account the plain meaning and purpose of the law as well as the intent of the drafters."[10] "Whether the superior court applied an incorrect legal standard is a question of law that we review using our independent judgment."[11]

We set aside factual findings of a lower court "only when they are clearly erroneous."[12] "[F]actual findings are clearly erroneous when, after a review of the record as a whole, we are 'left with a definite and firm conviction that a mistake has been made.' "[13]

---

[8]     *See* AS 46.03.822.

[9]     *Grimm v. Wagoner*, 77 P.3d 423, 427 (Alaska 2003).

[10]    *Native Vill. of Elim v. State*, 990 P.2d 1, 5 (Alaska 1999).

[11]    *Guttchen v. Gabriel*, 49 P.3d 223, 225 (Alaska 2002).

[12]    *Fred Meyer of Alaska, Inc. v. Bailey*, 100 P.3d 881, 883 (Alaska 2004).

[13]    *Id*. at 884 (quoting *Bennett v. Bennett*, 6 P.3d 724, 726 (Alaska 2000)).

"We review the superior court's decision to admit or exclude evidence for an abuse of discretion."[14] But "[t]he correct scope or interpretation of a rule of evidence creates a question of law 'to which this court applies its independent judgment, adopting the rule most persuasive in light of reason, precedent and policy.' "[15]

"We review an award of attorney's fees under an abuse of discretion standard."[16] "The trial court has broad discretion in awarding attorney's fees; this court will not find an abuse of discretion absent a showing that the award was arbitrary, capricious, manifestly unreasonable, or stemmed from improper motive."[17]

## IV. DISCUSSION

### A. The Superior Court Did Not Err When It Granted NPI's Post-Trial Request For Contribution And Equitable Allocation Under AS 46.03.822(j).

Alaska Statute 46.03.822(a) provides that "the owner and the operator of a . . . facility, from which there is a release . . . of a hazardous substance,"[18] is "strictly liable, jointly and severally, for damages."[19] This is Alaska's analog to the federal Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA),

---

[14] *Greene v. Tinker*, 332 P.3d 21, 31 (Alaska 2014).

[15] *City of Bethel v. Peters*, 97 P.3d 822, 825 (Alaska 2004) (quoting *State v. Coon*, 974 P.2d 386, 389 (Alaska 1999)).

[16] *Ware v. Ware*, 161 P.3d 1188, 1192 (Alaska 2007).

[17] *Id.* (quoting *United Servs. Auto. Ass'n v. Pruitt ex rel. Pruitt*, 38 P.3d 528, 531 (Alaska 2001)).

[18] AS 46.03.822(a)(2). "Facility" is broadly defined to include such things as a "structure," "equipment," and a "site or area at which a hazardous substance has been deposited, stored, disposed of, placed, or otherwise located." AS 46.03.826(3)(A)(i), (ii).

[19] AS 46.03.822(a).

which imposes strict joint and several liability under similar circumstances.[20]  Because this case was brought under section .822, our analysis turns first to the plain language of that statute;[21] federal law interpreting CERCLA is persuasive but not controlling.[22]

A person can escape the joint liability imposed by subsection .822(a) through apportionment.  Under subsection .822(i), "a person otherwise jointly and severally liable under [subsection .822(a)] is relieved of joint liability and is liable severally for damages and costs . . . if the person proves that (1) the harm caused by the release . . . is divisible; and (2) there is a reasonable basis for apportionment of costs and damages to that person."[23]  "Equitable considerations play no role in the apportionment

---

[20]    42 U.S.C. § 9607 (2012).  We have recognized that the Alaska legislature crafted the current version of AS 46.03.822 using CERCLA "as a pattern." *Fed. Deposit Ins. Corp. v. Laidlaw Transit, Inc.*, 21 P.3d 344, 353-54 (Alaska 2001); *see also Berg v. Popham*, 113 P.3d 604, 606 (Alaska 2005) (identifying section .822 as "Alaska's version of [CERCLA]").

[21]    *State, Dep't of Commerce, Cmty. & Econ. Dev., Div. of Ins. v. Alyeska Pipeline Serv. Co.*, 262 P.3d 593, 597 (Alaska 2011) (explaining that under the "sliding scale approach" to statutory interpretation, "[t]he plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be." (quoting *Gov't Emps. Ins. Co. v. Graham-Gonzalez*, 107 P.3d 279, 284 (Alaska 2005))).

[22]    *See Berg*, 113 P.3d at 609 ("Th[e] difference between Alaska and federal law reflects our legislature's intent to expand liability beyond CERCLA's standards.").

[23]    AS 46.03.822(i).  *Cf. Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 614 (2009) ("[A]pportionment is proper when 'there is a reasonable basis for determining the contribution of each cause to a single harm.' " (quoting RESTATEMENT (SECOND) OF TORTS § 433A(1)(b) (1965))).  Subsection .822(i) is similar to Restatement § 433A, which allows apportionment of damages "among two or more causes where (a) there are distinct harms, or (b) there is a reasonable basis for determining the contribution of each cause to a single harm."  Subsection .822(i) differs in that it requires a showing of *both* distinct harms *and* a reasonable basis for apportionment.

analysis; rather, apportionment is proper only when the evidence supports the divisibility of the damages jointly caused by the [potentially responsible parties]."[24] Persons relieved of joint and several liability by apportionment are liable for only their own divisible shares of costs and damages. The burden of proof is on the party seeking to avoid joint and several liability; this furthers the legislative policy that determinations of liability should be based on status, not fault, and should not stand in the way of prompt environmental response.[25]

"Not all harms are capable of apportionment, however";[26] jointly and severally liable parties who cannot prove the divisibility of harm and a reasonable basis for apportionment remain liable for the entire harm.[27] But they may bring claims for contribution against other persons who are also jointly and severally liable for the same harm, either in the same civil action or in a subsequent one.[28] Thus, once a party with a direct claim for damages against another has been found jointly and severally liable for

---

[24]  *Burlington N.*, 556 U.S. at 615 n.9.

[25]  *See Laidlaw Transit*, 21 P.3d at 348 ("When the legislature created a strict liability regime for hazardous substance contamination, it expressed its judgment that negligence remedies were not adequately controlling the hazardous substance contamination problem.").

[26]  *Burlington N.*, 556 U.S. at 614-15.

[27]  *See Spruce Equip. Co. v. Maloney*, 527 P.2d 1295, 1298 (Alaska 1974) ("Where the harm is single and indivisible, it is not apportioned between the plaintiff and the defendant, in the absence of a statute providing for such division of the damages upon an arbitrary basis." (quoting RESTATEMENT (SECOND) OF TORTS § 465 cmt. c (1966))).

[28]  AS 46.03.822(j); *Laidlaw Transit*, 21 P.3d at 354-55 (recognizing direct private cause of action, as well as cause of action for contribution, to recover for damages to property caused by environmental contamination under AS 46.03.822).

a release of hazardous substances, the court may, as it did here, "recast the direct claim as a claim for contribution upon conclusion of the litigation."[29]

In contrast with apportionment, which relates to the responsibility of a particular cause for a particular amount of damages, contribution claims essentially seek to allocate damages equitably among those who share responsibility.[30] Contribution under subsection .822(j) allows parties who are jointly and severally liable to recover from each other on the basis of equitable factors that the superior court determines are appropriate to the case.[31] But a person who has been "relieved of joint liability and is liable severally for damages and costs attributable to that person" under the apportionment analysis of subsection .822(i) cannot be made to contribute to persons who remain jointly and severally liable for all the damages; such a person is no longer an "other person who is liable under (a) of this section" and who can be pursued for contribution under subsection .822(j).

On this appeal, there is no dispute that Friesen and NPI were both strictly liable under section .822(a) for the diesel spill on Friesen's property, as owners and operators of the "facility" (broadly defined by statute to include both the equipment and

---

[29]     *Id.* at 350.

[30]     *See McLaughlin v. Lougee*, 137 P.3d 267, 275-79 (Alaska 2006) (discussing history of contribution claims in Alaska and recognizing common law contribution remedy "because it furthers the goal of apportioning of tort losses in accordance with each responsible person's percentage of fault").

[31]     *See Laidlaw Transit*, 21 P.3d at 350 (recognizing that "when a potentially responsible party sues for direct damages under the federal counterparts to subsections .822(a) and (j), the federal statutes allow the claim, but leave room for equitable distinctions upon conclusion of the litigation").

the site[32]) where the spill occurred.  But Friesen argues that the superior court erred when it granted NPI's claim for contribution and applied the equitable analysis.  He contends that contribution was inappropriate in this case because the jury had already apportioned the damages for which he could be held severally liable under subsection .822(i) when, in response to the verdict's questions about avoidable consequences, it identified the amount of damages he reasonably could have avoided.  In his view, the jury's finding that he reasonably could have avoided some of the damages was a determination that he was not responsible for any of the other damages.  We reject this argument for the reasons that follow.

### 1. The jury's finding of avoidable consequences was not an apportionment under AS 46.03.822(i).

In its most common configuration, the damages rule of avoidable consequences bars injured parties from recovering damages for any harm they could have avoided "by the use of reasonable effort or expenditure after the commission of the tort."[33]  When a fact-finder has concluded that an injured party reasonably could have avoided some of the harm, the injured party's damages may be reduced by apportionment.[34]  But as noted above, a party seeking apportionment under subsection

---

[32]    *See supra* note 18.

[33]    RESTATEMENT (SECOND) OF TORTS § 918 (1979); *see also Anchorage Indep. Sch. Dist. v. Stephens*, 370 P.2d 531, 533 (Alaska 1962) ("It is a cardinal rule in the law of damages that a plaintiff, with an otherwise valid right of action, is denied recovery for so much of the losses as are shown to have resulted from failure on his part to use reasonable efforts to avoid or prevent them.  This rule . . . is known as the avoidable consequences rule.").

[34]    *See* RESTATEMENT (SECOND) OF TORTS § 433A cmt. f (1979) ("The damages rule as to avoidable consequences, stated in § 918, which denies recovery for the aggravation of personal injuries or other harm resulting from the plaintiff's failure
(continued...)

.822(i) must make a threshold showing that the harm is divisible and there is a reasonable basis for apportionment. Here, we conclude that the jury's finding of avoidable consequences was not an apportionment under subsection .822(i), as Friesen argues, because neither the parties nor the court intended it to be and because Friesen did not make the threshold showing.

The jury was specifically instructed to determine whether there was any loss Friesen "could have avoided with reasonable efforts and without undue risk, hardship or embarrassment, even though the loss originally resulted from an act or omission for which NPI or Whitney is legally responsible." In its special verdict form the jury identified $7,687.40 as "the dollar amount of loss to Ryan Friesen due to the diesel spill on the Ryan Friesen property that Ryan Friesen reasonably could have avoided." The jury made no other findings on the subject of Friesen's liability. Its finding that he could have avoided some consequences of the spill did not resolve his liability as an owner for the remainder of the harm the spill caused — liability which, absent the required findings, was joint and several strict liability regardless of fault.

A review of the trial proceedings shows that the parties did not intend the jury to use the "avoidable consequences" instruction to apportion to Friesen a several share of harm. Friesen initially took the position that the jury should not be asked to apportion damages; NPI's counsel, on the other hand, suggested that "the court could be helpfully informed by the jury's input on apportionment" without feeling bound by it. But the parties' positions evolved over several days, as their counsel debated whether the jury should have any input into the apportionment of damages and, if not, whether it should be informed of the court's role in apportioning damages after trial. Friesen asked

_____

[34](...continued)
to use due care to avoid it after the commission of the tort, frequently requires such apportionment, and is merely an application of the rule stated here.").

that the jury be instructed, "You will be asked to determine the total amount of damages to the property; the court will also decide . . . how much damages to assign to each party." NPI objected, arguing that such an instruction would confuse the jury, cast doubt on its work, and prompt it to speculate about what the court would do. The court decided not to inform the jury about the possible post-verdict process.

At the end of NPI's case Friesen moved for a directed verdict on whether harm could be apportioned, on grounds that NPI had failed to prove the factual prerequisites. The court suggested, as it had before, that the jury be asked to decide the issue, to which Friesen's counsel responded that NPI "hasn't produced any evidence regarding divisib[ility]. So it's not a question that can go to the jury." The court denied the motion, explaining that it was still unclear whether the issue would be submitted to the jury in a second trial phase or decided post-trial by the court. The court asked for briefing on the issue, but it does not appear the parties submitted any before the close of trial.

Still, it is clear from the record that both parties ultimately understood the jury was not being asked to apportion damages. Friesen's counsel told the jury in his closing argument that it was being asked to determine the total amount of damage caused to his clients' property but not "to do any kind of allocation of fault . . . I don't want you to go back to the jury room and say, . . . we think perhaps NPI is only 30 percent at . . . fault; and, therefore, 30 percent of the total damages we're going to write in here. That's not how you do it." Before the court sent the jury out to deliberate, and referring specifically to "[subsection] (i) of the State CERCLA statute [the apportionment provision], whether that becomes a jury question or not," the court asked the parties whether they now were in agreement that apportionment was a question to take up only after the verdict. NPI agreed that it was. Friesen argued that the jury should at least be

allowed to allocate damages as between Friesen and Whitney, but the court explicitly disagreed.

Finally, after the jury returned its verdict and the jurors were polled, the court asked the parties whether they "need[ed] the court to do any further inquiry on damages or apportionment or anything; the jury can go?" to which counsel for both parties answered in the affirmative.

In sum, though positions shifted during trial, it is clear that neither party ultimately expected that the jury would decide how damages would be apportioned for purposes of subsection .822(i), notwithstanding the "avoidable consequences" instruction, and neither party asked that the jury make factual findings that could satisfy the prerequisites of that subsection. We conclude, therefore, that the jury's finding of avoidable consequences as to some damages was not, and was not intended to be, an apportionment of damages for purposes of subsection .822(i). By deciding that Friesen could have avoided certain damages with reasonable effort, the jury was not deciding that he was *not* jointly and severally liable for the rest.

### 2. The superior court properly ordered contribution pursuant to AS 46.03.822(j).

Following trial, NPI filed a motion for "contribution and equitable allocation" under AS 46.03.822(j). The superior court granted the motion and properly "recast the direct claim as a claim for contribution."[35] It conducted an analysis pursuant to subsection .822(j), in which it equitably allocated the entire $38,437 in remediation damages among Whitney, Friesen, and NPI. It properly relied on the jury's finding that Friesen could have avoided some of his damages to hold that he was "a non-innocent [potentially responsible party]" who could not avail himself of an "innocent landowner"

---

[35] *See Laidlaw Transit*, 21 P.3d at 350.

defense. And the court was acting within its authority under Alaska law when it made equitable findings in the contribution phase independent of the jury findings to support its allocation of damages.[36]

The court applied the same contribution analysis to the jury's award of $14,990 (reduced on remittitur to $10,787) for "expenses Ryan Friesen reasonably incurred in an effort to avoid or reduce other losses he reasonably believed were caused by NPI's 1995 Peterson Chipper on his land" — damages Friesen labels as "mitigation damages." He argues that "[i]nterpreting AS 46.03.822(j) to allow contribution for mitigation is an absurd result." But he does not explain how section .822 could be interpreted in any other way, or why mitigation expenses should be treated any differently than any other recoverable damages for purposes of contribution.

Strict liability under subsection .822(a) was the only cause of action that went to the jury. The parties apparently agreed that among the damages Friesen could ask the jury to award under subsection .822(a) were the mitigation expenses he incurred in moving the chipper from his land. The court so instructed the jury, the mitigation expenses were awarded under that category on the special verdict form, and there is no argument on appeal that the removal costs were *not* recoverable as damages under subsection .822(a).[37] The "damages and costs" that may be allocated under subsection

---

[36]    *See Vinson v. Hamilton*, 854 P.2d 733, 736 (Alaska 1993) ("In Alaska, the right to a jury in civil cases 'is preserved to the same extent as it existed at common law,' in suits where the amount in controversy is more than $250. If a party seeks only equitable relief, then there is no right to a jury trial." (quoting Alaska Const. art. I, § 16)).

[37]    Under the statutes' broad definitions, "damages" include "damages to persons," AS 46.03.822(m)(1), and "include *but are not limited to* injury to or loss of persons or property, real or personal, loss of income, loss of the means of producing income, or the loss of an economic benefit." AS 46.03.824 (emphasis added). We observed in *Kodiak Island Borough v. Exxon Corp.*, 991 P.2d 757, 764 (Alaska 1999),
(continued...)

.822(j) are not defined any differently than they are in subsection .822(a). We see no error in the court's analysis.[38]

> **B.   The Superior Court Did Not Abuse Its Discretion By Excluding The Environmental Report Regarding NPI's Port MacKenzie Property.**

The superior court granted NPI's motion to exclude a consultant's report on the environmental condition of NPI's property at Port MacKenzie, three years after the diesel spill at issue here, concluding that the report was "inadmissible Rule 404 evidence and would result in confusion to the jury." Alaska Evidence Rule 404 governs the admissibility of "propensity" evidence;[39] it provides that "[e]vidence of other . . . acts is not admissible if the sole purpose for offering the evidence is to prove the character of a person in order to show that the person acted in conformity therewith."[40] Propensity evidence may be admitted, however, if it is offered "for a proper purpose, 'including, but

---

[37](...continued)
that "[n]othing in the wording or legislative history of the hazardous substances statutes hints that subsection .822(a)'s more recently added examples of compensable harms were meant to exclude other claims for different spill-related harms or to constrict the universe of future recovery — for municipalities *or for any other prospective claimants*." (Emphasis added.)

[38]   Friesen does not challenge the findings that form the factual basis for the superior court's allocation of damages or the equitable factors that it chose to apply.

[39]   "In this context, the phrase 'propensity evidence' is legal shorthand; it means: evidence of a person's other bad acts whose sole relevance is to prove the person's character, so that the person's character can then be used as circumstantial evidence that the person acted true to character during the episode being litigated." *Bingaman v. State*, 76 P.3d 398, 403 (Alaska App. 2003).

[40]   Alaska R. Evid. 404(b)(1).

not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.' "[41]

Oakly Enterprises argues that the environmental report was admissible under Alaska Evidence Rules 404 and 406 to show that the spill from the Peterson chipper was due to "NPI's corporate culture [which] allowed for polluting" and was therefore not the "result of a mistake or an accident." We reject this argument. The proposed use of the evidence can only reasonably be characterized as to show a propensity — i.e., because NPI was responsible for pollution found at a different location, it must be responsible for the pollution on Friesen's and Oakly Enterprises' property three years earlier.[42] The superior court's decision to exclude the report under Evidence Rule 404 was not an abuse of discretion.

Nor was the report admissible under Evidence Rule 406, which allows evidence of a person's habit or an organization's routine practice "to prove that the conduct or the person or organization on a particular occasion was in conformity with the habit or routine practice." To be admissible, evidence of habit or routine practice must demonstrate, at the very least, a "regular practice of meeting a particular kind of situation with a specific type of conduct."[43] A habit is one that occurs with such

---

[41]   *Conley v. Alaska Commc'ns Sys. Holdings, Inc.*, 323 P.3d 1131, 1136 (Alaska 2014) (quoting Alaska R. Evid. 404(b)(1)) (emphasis omitted).

[42]   *See Wickwire v. Arctic Circle Air Servs.*, 722 P.2d 930, 934 (Alaska 1986) ("[E]vidence of negligence in inspecting one plane is not admissible as proof of negligence in inspecting another plane."); *Am. Nat'l Watermattress Corp. v. Manville*, 642 P.2d 1330, 1336 (Alaska 1982) (holding that it was error to allow testimony in negligence action against waterbed manufacturer when it concerned the manufacturer's post-accident conduct in not recalling the product or issuing warning).

[43]   Commentary, Alaska R. Evid. 406, first paragraph (quoting MCCORMICK (continued...)

frequency as to become nearly reflexive and automatic.[44] This view "aligns with a policy of caution in admitting evidence of a pattern of conduct as habit, out of concern that the rule admitting habit evidence will swallow the rule excluding character evidence."[45] As applied to this case, it would be unreasonable to conclude that a report of environmental contamination three years after the diesel spill at issue shows NPI's "regular practice of meeting a particular kind of situation with a specific type of conduct." The superior court did not abuse its discretion when it held the evidence inadmissible under Rule 406.

Finally, evidence admissible under other rules must still be excluded under Alaska Evidence Rule 403 if its probative value is outweighed by its unfairly prejudicial effect.[46] And Evidence Rule 404(b)(1)'s presumption that propensity evidence is inadmissible "alters the normal Rule 403 balancing test" so that the party seeking to pass the test "must show that the evidence's use for non-propensity purposes will be substantial enough to outweigh the substantial risk of prejudice that such evidence always carries."[47] Evidence of conditions at NPI's Port MacKenzie property had little relevance to whether NPI's Peterson chipper caused pollution on Oakly Enterprises' property. The three-year span between the spill and the report made its conclusions even

---

[43](...continued)
ON EVIDENCE § 195, at 462 (2d ed. 1972)).

[44]    *See Wacker v. State*, 171 P.3d 1164, 1169 (Alaska App. 2007).

[45]    *Id.* (citing STEPHEN A. SALTZBURG ET AL., 2 FEDERAL RULES OF EVIDENCE MANUAL § 406.02 (9th ed. 2006)).

[46]    *See Conley*, 323 P.3d at 1136 (noting that if a court determines that propensity evidence is admissible for a proper purpose under Evidence Rule 404(b)(1), then Evidence Rule 403 "requires the court to weigh the probative value of the evidence against the danger of unfair prejudice").

[47]    *Id*. at 1144 (Fabe, C.J., dissenting).

less relevant to the issues being litigated. And the superior court, in excluding the report, further noted that it would confuse the jury, likely because of its remoteness from the events at issue in terms of both time and geography. For all these reasons, we see no abuse of discretion in the superior court's exclusion of the report.

**C.   The Superior Court Did Not Abuse Its Discretion In Its Award of Attorney's Fees Against Oakly Enterprises.**

For cases that go to trial, prevailing parties who do not recover money judgments are entitled to fee awards that are 30 percent of their "reasonable actual attorney's fees which were necessarily incurred."[48] The superior court determined that neither Friesen nor NPI was a prevailing party on the claim between them, but that NPI had prevailed over Oakly Enterprises and was entitled to attorney's fees of $36,764.63. The court's starting point in calculating the fee award was NPI's claimed actual fees of $321,812.50. From this amount it subtracted $76,715, reflecting work done during the contribution phase when Oakly Enterprises was only minimally involved. The court divided the remainder, allocating half to NPI's litigation against Friesen and half to its litigation against Oakly Enterprises. Of the half of the total attributable to the litigation against Oakly Enterprises, the court awarded NPI 30 percent of it as required by Alaska Civil Rule 82(b).

Oakly Enterprises contends that NPI's fees should have been further reduced because they were disproportionate to both Oakly Enterprises' fees, which it claims were only $75,000, and the amounts ultimately at issue.

We have held that "[a]n attorney's fees decision 'should not be disturbed unless it is manifestly unreasonable.' "[49] The reasonableness of fees depends on a

---

[48]   Alaska R. Civ. P. 82(b)(2).

[49]   *Alaskan Crude Corp. v. State, Alaska Oil & Gas Conservation Comm'n*, (continued...)

number of factors, including whether there was a trial, "the complexity of the litigation, the length of trial, and the reasonableness of the attorneys' hourly rates and the number of hours expended."[50] A large discrepancy between the fees incurred by the winning and losing sides "can be some evidence that [the prevailing party's] fees are unreasonable," but "it is not conclusive on that point as there are a number of other possible explanations for such a discrepancy."[51] For example, "burdens assumed by opposite sides of litigation are not necessarily equal, and it is a judgment call as to whether such a discrepancy reflects over-preparation and over-billing."[52] In this case, Oakly Enterprises' claim against NPI involved summary judgment proceedings and an eight-day jury trial. The trial judge was personally aware of the quality and quantity of the work NPI's attorneys performed. Her calculation of the award — including a list of reductions for specific entries devoted to post-trial proceedings — shows that she carefully reviewed the itemized billing records in support of NPI's application. We see no abuse of discretion in her conclusion that a discrepancy in fees did not require further reduction.[53]

---

[49](...continued)
309 P.3d 1249, 1254 (Alaska 2013) (quoting *Miller v. Matanuska-Susitna Borough*, 54 P.3d 285, 289 (Alaska 2002)).

[50]     *Krone v. State, Dep't of Health & Soc. Servs.*, 222 P.3d 250, 253 (Alaska 2009) (internal quotation marks omitted).

[51]     *Gamble v. Northstore P'ship*, 28 P.3d 286, 289-91 (Alaska 2001).

[52]     *Id*. at 289-90.

[53]     Oakly Enterprises highlights the work on an attorney's fees motion as an example of what it claims to be excessive billing by NPI's attorneys. The motion, apparently drafted episodically over the course of several months, summarized the case's history before addressing the prevailing party issue, attorney's fees under both Alaska Civil Rule 68 and Rule 82, and the allocation of fees and costs between Oakly
(continued...)

Oakly Enterprises correctly observes that NPI's total fees exceeded the amount in controversy. But "[w]e have never stated that spending more on attorney's fees than the amount in controversy is per se unreasonable."[54] Friesen and Oakly Enterprises alleged in their complaint that their property damage and cleanup costs would "exceed $150,000," and the summary judgment motions, jury trial, and extensive post-trial proceedings provide an explanation for why the costs of litigation were hard to contain. Again, the claimed lack of proportionality does not cause us to question the superior court's exercise of its discretion.[55]

## V.    CONCLUSION

The judgment of the superior court is AFFIRMED.

---

[53](...continued)
Enterprises and Friesen. Giving due deference to the superior court's closer view of the attorneys, their work, and its significance in the litigation, we see no abuse of discretion in the court's failure to reduce the fees claimed for this activity.

[54]    *Okagawa v. Yaple*, 234 P.3d 1278, 1282 (Alaska 2010). *Cf. Rhodes v. Erion*, 189 P.3d 1051, 1053 (Alaska 2008) (stating "that whether [defendant] spent more on her defense than the amount in controversy is not dispositive" when determining whether attorney's fees award should be reduced).

[55]    Friesen includes a challenge to the superior court's prevailing party determination in the appellants' statement of issues presented for review, but it is not addressed in his argument, and we therefore consider it waived. *See Adamson v. Univ. of Alaska*, 819 P.2d 886, 889 n.3 (Alaska 1991) ("[W]here a point is given only a cursory statement in the argument portion of a brief, the point will not be considered on appeal.").